TRAPNALL'S ADX. VS. BROWN.

Where the defendant denies the agreement or contract, relating to real estate, alleged in the bill, it is not necessary for him to insist, in his answer, upon the statute of frauds, as a bar. (*Wynn vs. Garland ante.*)

T. had the control of several judgments against B. upon which executions were issued and levied upon a house and lot, worth largely more than the amount of the judgments: at and before the sale under the executions, T. and B. entered into a parol agreement, to prevent the sacrifice of the property, that T. should bid it in, take possession and receive the rents and profits until the judgments were satisfied, or otherwise paid by B.: other persons, upon being informed of the agreement, declined to bid for the property, and T. purchased it for a nominal sum: *Held*, that the case was excepted out of the statute of frauds; and that it would be a fraud in the purchaser to keep the property in violation of the agreement.

*Appeal from the Circuit Court of Pulaski county in Chancery.*

Hon. WILLIAM H. FEILD, Circuit Judge.

PIKE & CUMMINS, for the appellant.

We need scarcely refer to authority to prove, that, where an agreement, set up in a bill, *is denied*, the *statute* of *frauds* is available to the defendant, without expressly pleading or relying upon it.  3 *A. K. Marsh.* 445; 4 *Ark.* 301; 2 *Sto. Eq.* 757; 1 *Pet. C. C. R.* 388, 380.

It is equally familiar that no trust, or contract can be enforced, or executed, which in any way originates in fraud, or in any act which contravenes any positive law, or any general principle established as the policy of the country.  *Dyster in the matter of Moline*, 1 *Merr.* 171; *Curtis vs. Perry*, 6 *Ves.* 739, *and notes; Methwold vs. Wablank*, 2 *Ves. Sen.* 238; 15 *Ves.* 156; 17 *Ves.* 253, 4.

Any contract or trust, which merely savors of such illegality,

is never enforced—even where, as between man and man, there could be no objection to the transaction. *Wood vs. Downes*, 18 *Ves.* 125; *Strackan vs. Brander*, 1 *Eden* 306; *Burke vs. Green*, 2 *B. & B.* 521; 2 *Atk.* 224; 2 *Jac. & Walk.* 136.

Every attempt to prevent fair and open competition at execution sales, has been held void, as contravening public policy, however much the party may have gained or lost by reason of his contract. *Thompson vs. Davies*, 13 *J. R.* 112; 8 *J. R.* 444; 6 *J. R.* 194; 4 *Pet.* 187; 2 *Watts* 383.

The Court will relieve neither party to a contract infected with fraud. 5 *Eng.* 59; 3 *Ark.* 262; 5 *Paige* 114; 20 *Wend.* 32; 11 *Wheat.* 258.

Our statute requiring trusts in lands, or conveyances, or contracts for conveyances of lands, to be in writing, is substantially the same as the English statute of Charles the second. *Sec.* 1, 10, 12, 13, *ch.* 73 *Rev. Stat.; Hill on Tr.* 56.

There is, here, no resulting trust, or one arising by operation of law. This could only arise in any view of the facts of this case, at the moment the execution sale was made. At that time, nor ever after, was any part of the price paid by Brown. 1 *Lom.* 204; 5 *Georgia Rep.* 241; 4 *Ark.* 521 *and cases cited; Scott vs. Shepperd*, 3 *Gilman* 483. *Hill on Trust.* 98 *and cases cited in notes.*

Whether this is a bill to enforce a trust, or execute a contract there are defects in the case which must be fatal to it.

1st. The complainant must show a strict compliance, by himself, in every thing to be done by him, within the time contemplated by the contract. 3 *Hayw. R.* 202, 3; 9 *Yerg.* 298; 3 *Hump.* 644; 3 *Yerg.* 18, 26, 55, 58. 9 *Smed. & Marsh.* 230, 535; 9 *Eng. Cond. Ch. R.* 533, 536; 2 *Sto. Eq., sec.* 736; 3 *Ves.* 692, *and cases cited in note.*

2d. The contract must be based upon a fair consideration, and must be certain in its terms. 1 *J. C. R.* 337; 6 *Ves.* 662; *Bat. on Spef. Perf.* 32, 35, 37; 39, *etc.;* 5 *Georgia R.* 341.

3d. No laches or delay must occur, on part of complainant. *Bat. Spe. Perf.* 258, 9, *etc.;* 13 *Ves.* 228, 9; 5 *Ves.* 823; 4 *Brown*

471, 2; 7 *Paige*, 22; 3 *J. Cas.* 62, 65; 4 *Eng. Cond. Ch. R.* 536; 3 *Marsh.* 446; 9 *B. Monr.* 11; 3 *Litt.* 293; 3 *Monr.* 128.

4th. The remedies as to the rights of the parties, must be *mutual.* 13 *Ves.* 228; 6 *Wheat.* 539; *Batt.* 299.

5th. No case can be shown where a party is to become trustee on a future event, that a *parol contract* is sufficient. 1 *J. C. R.* 347.

The complainant utterly fails in each of the foregoing points.

WATKINS & GALLAGHER, for the appellee.
A resulting trust can be created by parol and proven by parol. 4 *Black.* 539; 2 *Ib.* 441; 8 *N. Hamp.* 187; *Walker* 197; 8 *S. & R.* 484; 1 *Bibb* 509; 4 *J. J. Marsh.* 590; 2 *J. C. R.* 405.

And resulting trusts or trusts by implication are not within the statute of frauds. *Peabody vs. Tarbill,* 2 *Cush.;* 11 *Ill. Rep.* 600; 8 *Humph.* 447; 11 *Barb. S. C. Rep.* 399.

Where a creditor, at execution sale, acts in such a manner as to induce the belief that he is bidding for the purpose of obtaining the property and allowing the debtor the right to redeem, it will be declared a trust. *Harris vs. Casey,* 10 *Humph.* 342; *see also Pegues vs. Pegues,* 5 *Ire. Eq.* 418; *Jones vs. Hubbard's Rep.,* 6 *Munf. Rep.* 261.

There was mutuality. Trapnall was to be paid the purchase money, and amount of judgments controlled by him. Brown was to be deprived of the possession of his property, and the rents and profits thereof, and allow it to be sold for less than its value. It was a fraud on Trapnall's part to refuse to perform the contract.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 15th of July, 1851, Wm. Brown, sr., filed a bill against Frederick W. Trapnall, on the chancery side of the Pulaski Circuit Court, alleging in substance as follows:

On and before the 27th of November, 1843, complainant was the owner of lots numbered 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11, in block No. 73, west of the Quapaw line, in the city of Little

Rock, upon which he had before then erected a large and commodious brick dwelling, out houses, etc., at a cost, including the price of the lots, of seven or eight thousand dollars, and which were then, and ever since, of the actual salable value of at least $5,000.

On the 27th of Nov. 1843, the sheriff of Pulaski county, having levied upon the lots, offered them for sale, under an execution issued upon a judgment of the Pulaski Circuit Court in favor of Stillwell against complainant and others for about $159, and no one appearing disposed to bid for the lots, complainant requested defendant, who was present at the sale, to bid them off for him. Whereupon the defendant bid $50, for the lots, and they were stricken off to him, but he paid nothing to the sheriff upon the bid; and shortly afterwards the complainant paid to the attorney of Stillwell the full amount of the judgment. Afterwards, without directions, the deputy of the sheriff, through inadvertence, executed a deed to the defendant for the lots, bearing date 16th December, 1843, which was recorded, but complainant had no knowledge, for more than four years afterwards, that such deed had been executed.

On the 26th September, 1842, Tappan, (for whom defendant was attorney,) obtained a judgment in Pulaski Circuit Court against complainant for $537 73 debt and $252 80 damages: upon which an execution issued, was levied on the lots and returned without sale. A *Vend. Ex.* afterwards issued to the sheriff, Lawson, who offered the lots for sale on the 21st of April, 1845, and the defendant became the purchaser for $1, and took the sheriff's deed therefor, which was recorded, etc.

Tappan's judgment remained to be paid by complainant, and would be paid without reference to said sale, to the entire satisfaction of Tappan. Complainant was not aware until shortly before filing the bill, that defendant had taken the sheriff's deed for the lots under this purchase, the title being in him, as complainant well known, by purchase under a judgment in favor of Wasson, pursuant to an agreement between complainant and defendant hereinafter stated.

On the 11 of March, 1841, Wasson obtained judgment, in Pulaski Circuit Court, against Byrd and complainant for $232 90, upon which a *fi. fa.* was issued returnable to the April term, 1845; and which the sheriff, Borden, levied upon the lots, offered them for sale on the 21st of April, and the defendant became the purchaser for $175, and took the sheriff's deed therefor, etc.

At that time complainant owed a balance of $53 50, to Gray & Co., (for whom defendant was attorney,) upon a judgment recovered by them, in the Pulaski Circuit Court, against complainant and his son, William Brown jr. On the 9th of Nov., 1841, the defendant and his partner, John W. Cocke, had also recovered a judgment, in the same Court, against Carter, complainant and others, for $583 89, bearing ten per cent. interest, upon which an execution had been issued, returnable to the April term, 1845, and had been levied upon property of the complainant other than the lots aforesaid. The complainant had also been the security of R. C. Byrd upon a debt of $5000, due to the bank of the State, which complainant had assumed, prior to the 21st of April, 1845, and executed his own note therefor, with Albert Pike as his security, and which remained unpaid at that time. Pike had no indemnity, and complainant desired to secure him against loss on account of such suretyship.

Under these circumstances, complainant having implicit confidence in defendant, on the 21st of April, 1845, and before either of the two sales last mentioned, agreed with the defendant that he should purchase the lots under the executions, for any sum, nominal or otherwise, that he might bid therefor, and take the deeds of the sheriff to himself, and hold the possession of the lots and the improvements thereon, and receive the rents and profits thereof, as a security for the reimbursement of the sum that might be bid by him for the lots, and the payment of the amounts due on the said judgments in favor of Gray & Co., and Trapnall & Cocke, and for the indemnity of Pike as the security of Complainant upon the bank debt: that is, that defendant should hold the property, and receive the rents until such time as the complainant should pay the several sums afore-

said, with interest, either in money, or out of the rents of the property; and should also pay the bank debt, or relieve Pike for liability thereon.

The inducements to this agreement were, that complainant was unable to pay the judgments at the time, and was solicitous that the lots should not be sold absolutely and at a sacrifice; and the defendant, as complainant then supposed, had no wish to sacrifice the property, but was unwilling to risk impairing the lien of the judgments by extending indulgence, etc. Complainant and Pike were, also, both anxious that the latter should be indemnified in respect to the bank debt, etc.; and Pike being cognizant of the said agreement, and in fact a party thereto, and reposing confidence in the defendant, was satisfied therewith. The agreement induced by these motives, and none other on the part of complainant, was well understood by the parties on the morning of, and before the sale of the lots by the sheriff.

Defendant was indebted to complainant, on open account, in the sum of $100, for labor, materials, etc., furnished before and after the sale, and which had been permitted to stand over, subject to final settlement between the parties under the agreement, etc.

Defendant received possession of the lots from complainant in July, 1845, and had continuously from thence until the filing of the bill, rented them to responsible tenants, for from $250, to $275 per annum, for which he was accountable, etc.; and the rents so received by him, together with the $100, which he owed complainant, as above stated, were more than sufficient, after deducting taxes and repairs, to discharge the judgments, demands, etc., with interest, which by the terms of the agreement were to be paid to the defendant, and for which he was to hold the lots as a security.

On the 7th of January, 1848, Byrd, the original debtor, paid the bank debt, and Pike was released from all liability thereon as the security of complainant.

Whereupon complainant submits that defendant had no longer any right to retain the possession of the property, and

receive the rents, etc. That complainant had the beneficial interest and estate therein; and the objects for which the lots were pledged and confided to the defendant in trust, as above stated, being fully accomplished, he stood seized of the naked legal title to the property as trustee and for the benefit of complainant, etc.

Complainant further avers that after the payment of the bank debt, he repeatedly called upon defendant for a settlement and account of rents, etc., in order that he might ascertain whether any sum remained due to him, upon the judgments, etc., under the agreement, and if any, to pay the same; and finally after complainant was satisfied that the demand of defendant had been fully discharged by the rents, etc., he requested him to reconvey the property to complainant, etc. But the defendant had, from time to time, by various excuses and pretexts, evaded the requests of complainant, and finally refused to comply therewith.

Prayer, that an account be taken between the parties, and if any balance should be found to be due to defendant, complainant offered to pay the same: and that defendant's title to the lots be divested, etc. That he be treated as a trustee in equity, and compelled to convey the lots to complainant, and for general relief, etc.

The defendant, in his answer, claims no benefit of his purchase of the lots under the Stillwell execution.

He admits that he purchased the lots under the other judgments, on the 21st April, 1845, and took the sheriff's deeds therefor, as stated in the bill, but he denies that he bid for, or purchased the lots under any agreement, with complainant, or any other person, such as stated in the bill.

He states that shortly after the sale, he met with complainant and told him that he had not purchased the property as a speculation, but merely for the purpose of securing the judgments which he had obtained against him: and that if he would pay him back what he had advanced on the purchase, and pay the judgments aforesaid, he would cheerfully reconvey the property

to complainant; to which he consented. That this was the only arrangement ever made between them. That complainant never did, in any conversation, mention to respondent that he was desirous, out of said property, to indemnify Pike in said securityship for him, or make any suggestion to him in relation thereto. Nor was there any understanding, or agreement, in any form or shape, that respondent should hold said property, and pay the sum advanced by him therefor at the sale, and said judgments, out of the rents thereof, nor did he in any manner or form hold the lots for complainant, except as aforesaid.

Complainant failing to redeem the lots as above proposed to him by respondent, and not offering to do so, respondent took possession thereof in July, 1845, and had ever since received the rents, and treated them as his own property.

Complainant had never offered to redeem the lots until within a few days before the filing of the bill, and then in an offensive manner, and respondent then felt himself under no obligation to permit him to do so. He states an account of the rents received by him, but there is no question before us in reference to them.

The above is the substance of so much of the answer as is material to the points to be decided by us. The answer was not sworn to.

The cause was heard upon bill, answer, replication, exhibits and depositions; the Court decreed to complainant the relief prayed by the bill, and referred the cause to the master to take and state an account between the parties.

In the meantime Trapnall died, his administratrix and heir were made parties, and they appealed from the decree to this Court.

On the hearing, the depositions of five witnesses were read on the part of Brown, and none for the defence. These depositions conduced to prove that before the sale of the lots under the executions, on the 21st of April, 1845, an agreement, substantially as stated in the bill, was made between Brown and Trapnall, and that the latter purchased the lots in pursuance

thereof.   It moreover appears that other persons, who attended
the sale, were induced not to bid for the lots, in consequence of
being informed that such agreement had been made between
the parties.

When it is remembered that Trapnall's answer was not sworn
to, (although the Court afforded him an opportunity of doing so
after it was filed,) there can be but little room to doubt that the
depositions established the truth of the conclusion above an-
nounced.

This disposed of the only material issue of fact made by the
answer, and would dispose of the case, but for the reason that
the counsel for the appellants, in their argument here, have in-
sisted upon the benefit of the statute of frauds, which was not
interposed as a defence by the answer.

Though there is some conflict of authorities on the point, the
better opinion seems to be, (as held in *Wynn vs. Garland,*
present term,) that where the defendant denies the agreement
or contract alleged in the bill, as in this case, it is not necessary
for him to insist, in his answer, upon the statute as a bar: for
the reason that under such denial, the complainant must pro-
duce legal (written and not parol) evidence of the existence of
the agreement, etc.

The 12th section of the statute of frauds provides that, " all
declarations or creations of trusts or confidences of any lands '
or tenements, shall be manifested and proven by some writing,
signed by the party who is or shall be by law enabled to de-
clare such trusts, or by last will in writing, or else they shall be
void," etc. etc.

The 13th section provides that, " where any conveyance shall
be made of any lands or tenements, by which a trust may arise
or result by implication of law, such trust or confidence shall
not be affected by any thing contained in this act." *Digest
chap.* 73.

These sections of our statute are substantially the same as
the 7th and 8th sections of the English statute of frauds, 29th

Car. II, which have been adopted in most of the American States.    4 *Kent Com.* 317.

Prior to the passage of the statute, the declaration or creation of a trust of lands could be proven by parol testimony as any other contract.   *Adams Equity* 28.   It is to be observed that the statute (*sec.* 12) does not require that the trust itself be created by writing: but only that it be manifested and proven by writing, plainly meaning that there should be evidence in writing, proving that there was a trust, and what the trust was.   1 *Greenlf. Ev., sec.* 266.

*Resulting trusts,* or those which arise by implication of law, are specially excepted from the operation of the statute, (*sec.* 13.)   Trusts of this sort were said by LORD HARDWICK, in *Lloyd vs. Spillet,* 2 *Atk.* 148, to arise in three cases; *first,* where the estate is purchased in the name of one person, but the money paid for it is the property of another; *secondly,* where a conveyance is made in trust, declared only as to part, and the residue remains undisposed of, nothing being declared respecting it; and *thirdly,* in certain cases of fraud.   1 *Greenf. Ev. sec.* 266; *Miller et al. vs. Cotten et al.,* 5 *Geo. R.* 346; 4 *Kent Com.* 305.   In all these cases, it seems now to be generally conceded that parol evidence, though received with great caution, is admissible to establish the collateral fact (not contradictory to the deed, unless in case of fraud) from which a trust may legally result.   1 *Greenlf. Ev., sec.* 266; 1 *W. & T. Lead. Cases in Eq., by Hare & W.,* 187 to 206, top paging, and cases cited.

It is manifest that the case before us, does not fall within the first or second classes of *resulting trusts,* as defined by LORD HARDWICK, and generally recognized in the books. If it is excepted out of the statute (*sec.* 12,) at all, it must be upon the grounds of fraud.

In *Hoxie vs. Carr et al.* 1 *Sumner R.* 187, JUDGE STORY, stated it to be his impression that the exception in the statute of frauds (in England and Massachusetts) as to resulting trusts, had been deemed merely affirmative of the general law, and not as creating a saving of resulting trusts, which would otherwise have

been cut off unless in writing. And Mr. KENT, *in note to* 4 *Com. p.* 305, 8 *Ed.*, after citing this opinion of STORY, remarks, "and most certainly trusts must arise in many cases in equity, from the manifest justice and necessity of the thing, *without any statutory exception*, and especially in cases of conveyances procured by *fraud*.

LORD HARDWICK said, in *Reech vs. Kennegal*, 1 *Vesey* 125, that the Court has adhered to this principle, that the statute of frauds should never be understood to protect fraud; and therefore, whenever a case is infected with fraud, the Court will not suffer the statute to protect it, so as that any one should run away with a benefit not intended. *Hill on Trustees, p.* 166.

In *Miller et al. vs. Cotten et al.*, 5 *Geo. R.* 346, the Court said: We recognize the doctrine then, that a Court of equity will not permit the statute of frauds to be set up as a defence by a party infected with fraud: and that parol trusts of real estate may be established, in direct contradiction to the statute, on the ground of fraud. And that whenever a case of fraud is made by the bill, parol evidence will be received for the purpose of sustaining that case, even though the effect of such evidence be to alter or vary a written instrument, and although the benefit of the statute be insisted on by the defendant." *Hill on Trustees*, 166.

In this case, the property, it seems, was worth as much as $5000. By means of the agreement made between the parties, Trapnall was enabled to purchase it, under the two executions, for $176. Other persons declined bidding for the property on being informed of the objects of the agreement. It may be inferred from all the facts of the case, that but for the agreement, and the confidence which Brown reposed in Trapnall, he would have made other arrangements to prevent the sacrifice of his property—at least that it would have sold for something nearer its value than it did. Under these circumstances, we think it would be a fraud in the purchaser to keep the property in violation of the agreement. That the statute, which was designed to prevent frauds, would be used as a shield, and a defence in

the commission of fraud, which the Courts of equity will not tolerate.

We think, therefore; that the Court below did not err in treating the purchaser as a trustee, under all the circumstances of the case.

The following cases are similar to the one before us, in many of their features, and sustain the conclusion to which we have arrived. *Jones vs. Hubbard's Rep.*, 6 *Munf.* 261; *Haywood et al. vs. Ensley et al.* 8 *Humph.* 460; *Davis et al. vs. Hopkins*, 15 *Illinois* 519; *Peebles vs. Reading*, 8 *Serg. & Rawle*, 485. In connection with this case, it may be remarked that the 7th section of the English statute of frauds, in relation to the creation of trusts of lands, had not been adopted in Pennsylvania, but the judge remarked that even if the statute applied, in cases of fraud, etc. a trust would be implied, etc. See also 1 *Murphy* 116; *Leiwring vs. Black*, 5 *Watts* 304; *Neely vs. Torian*, 1 *Dev. & Bat.* 410; *Caple et al. vs. McCollem*, 27 *Ala.* 465; *Parker vs. Bragg et al.*, 11 *Humph.* 212; *Keatts vs. Rector*, 1 *Ark. R.* 391; *Orr vs. Pickett*, 3 *J. J. Marsh. R.* 276.

There are many cases to be found in the books, where one purchased land at public sale, with his own means, upon a verbal agreement to convey to another on repayment of the purchase money, but afterwards refused to do so, and the agreement was held to be within the statute of frauds, and not enforceable as a trust in equity. But we suppose the careful and intelligent reader will readily distinguish the difference between all such cases and the one now before us.

It is moreover insisted by the counsel for the appellants that the agreement between the parties in this case, if established as alleged in the bill, must be treated as a contract to hinder, delay and defraud the creditors of Brown, and therefore not enforceable at his instance.

But it is not alleged in the answer, nor proven, that such was the object of the agreement.

Brown's object in making the agreement appears to have been to prevent the sacrifice of the property, to secure the pay-

ment of several of his judgment creditors, and to indemnify Pike as his security upon a large debt in bank. Moreover, no creditor of Brown is complaining upon the record before us, or seeking to avoid the agreement on the grounds of fraud; nor has it been made to appear that any of his creditors were defrauded or injured by the arrangement between him and Trapnall. But if they were, the Court does not perceive how it could benefit them by holding the agreement to be void, and permitting the appellants to keep the property.

The decree of the Court below is affirmed.